RANDOLPH H. WINSTON, Suing for Himself and on Behalf of All Other Stockholders of Saugerties Farms, Incorporated, Respondent, *v.* SAUGERTIES FARMS, INCORPORATED, Defendant, Impleaded with ELLIOTT B. SMOAK and ANNA V. SMOAK, Appellants.

Third Department, July 2, 1941.

*Paul Fromer* [*George F. Kaufman* and *Lester R. Smith* of counsel], for the appellants.

*Charles de la Vergne* and *Francis Martocci*, for the respondent.

FOSTER, J. Defendants Elliott B. Smoak and Anna V. Smoak appeal from a judgment voiding 100 shares of capital stock of the Saugerties Farms, Incorporated, issued to them on June 26, 1939. The complaint charges that the issuance of this stock was fraudulent as to the rights of the plaintiff and other stockholders, and that the corporation did not receive any money, labor or property therefor.

There is little dispute as to the facts. Prior to June 26, 1939, the plaintiff Winston was the owner of a large farm in Ulster county, together with farm machinery used in connection therewith; a herd of seventy Guernsey cattle kept thereon, and considerable equipment used in the operation of two milk routes. All of this property was heavily incumbered and Winston was obliged to make regular and substantial payments of principal and interest thereon. His operating expenses were also heavy. His herd had been depleted by the loss of thirty-five cows from disease and he needed replacements to increase his milk production but was without funds to obtain them. The conclusion may also be drawn that his business was in need of more experienced and efficient management.

The defendant Elliott B. Smoak owned a farm in Greene county. Apparently he was a man of considerable experience in the retail milk business and in the operation of farms in general. He had been selling milk from his herd to a local creamery and was looking for a more satisfactory outlet. In April or May of 1939, Smoak visited Winston at the latter's farm and offered to sell him milk. There was some objection to this, and after several other visits it was proposed that they would go into the milk business together and form a corporation to carry on the same. To carry out this proposal a written agreement was drawn and executed in the office of a reputable attorney on June 1, 1939.

This agreement provided for the formation of a corporation to be called Saugerties Farms, Incorporated; the transfer by Winston to such corporation of his farm, cattle and equipment, subject to all existing liens; the assumption by the corporation of the payment of these liens and of taxes and insurance premiums; the retention by Winston of all accounts receivable accruing prior to June 1, 1939, subject to payment by him of all bills incurred prior to that date except those that were expressly specified for assumption by the corporation; the exclusive devotion of Smoak's personal services to the management of the farm and business of the corporation; the election of Winston as president of the corporation and of

Smoak as secretary and treasurer thereof; the payment by the corporation to Winston of a salary of twenty-five dollars a week, and the payment thereafter of taxes, insurance and interest; that Smoak should rent his cattle to the corporation and have a claim to the next moneys equal in amount to the salary paid to Winston; the division of any net profits above the total payments thus provided between Winston and Smoak equally; and the issuance of equal amounts of stock of the corporation to Winston and Smoak or their nominees.

Shortly after the agreement was signed, Smoak brought his herd of cattle to the Winston farm. At the same time he took over the management of the farm and continued in this capacity until judgment herein was entered. On June 22, 1939, the certificate of incorporation of the Saugerties Farms was filed. It fixed the capital stock of the corporation at $20,000, to consist of 200 shares of common stock at a par value of $100 each. One hundred shares were issued to Winston, eighty shares to Smoak, and twenty shares to the latter's wife. Winston, Smoak and Smoak's wife were named as directors until the first annual meeting of the stockholders. At Winston's own request, his wife was not named a director. Subsequently, Winston was elected president of the corporation, Mrs. Smoak vice-president, and Smoak secretary and treasurer. The directors held a meeting on June 26, 1939, and by a formal resolution approved the contract made between Winston and Smoak which provided for the transfer of the former's real and personal property to the corporation and by the terms of this resolution the offer of such a transfer was accepted. The resolution recited: " In the judgment of this Board of Directors the assets to be transferred to the corporation are reasonably worth the amount of the consideration demanded therefor, and that it is to the best interests of this corporation to accept the said offer as set forth in said proposition." It also provided: " This corporation shall, as full payment for said property, issue and deliver to said Randolph H. Winston and Elliott B. Smoak or to their nominees, two hundred (200) shares of the full paid and non-assessable capital stock of this corporation."

Winston then conveyed to the corporation his farm subject to the mortgages thereon, which the corporation assumed and agreed to pay, and also conveyed to the corporation the personal property located upon the farm subject to all conditional sale contracts and chattel mortgages of record which the corporation assumed and agreed to pay. He also assigned to the corporation all his right, title and interest in and to the business. Later, and on November 9, 1939, he executed and delivered to the corporation a bill of sale

of all of the cattle and farm machinery used in connection with the operation of the farm.

The evidence indicates that the value of the assets conveyed to the corporation in the first instance was far in excess of the amount of stock provided for in the certificate of incorporation and issued in accordance therewith. After the resolution mentioned had been passed, twenty shares of the capital stock were issued to plaintiff's wife, eighty shares to Winston himself, twenty shares to Anna V. Smoak and eighty shares to Elliott B. Smoak. With the exception of a few weeks when he was ill, Smoak continued to manage the corporate farm and business. Winston saw him nearly every day between June 26, 1939, and the 25th day of November of the same year when Winston went to Florida. There is no evidence that during this period Winston indicated that he was dissatisfied with the arrangements which had been made. In fact, he made no protest whatever until more than ten months after the execution of the contract, when he went to the farm with his attorney and demanded that Smoak and his wife return the stock. After the organization of the corporation Winston drew a salary of twenty-five dollars per week, while Smoak received no compensation whatever. During that period the milk from Smoak's herd was included with the milk produced by the cows owned by the corporation and the corporation received the proceeds thereof.

On the trial plaintiff's counsel repudiated any allegation of fraud, not once, but several times. Relying upon these statements the defendants offered no testimony. Despite this the trial court has indicated in his opinion, and also in some of the findings, that Smoak did not act in good faith in his dealings with Winston. We do not think the record before us supports the finding of bad faith or fraud. It is clear that plaintiff voluntarily made a contract by which he agreed to join in the formation of a corporation, to convey his farm and business equipment to it in return for all of its capital stock and to give one-half of this stock to Smoak. Smoak on his part agreed that he would assume the entire management of the farm and business without salary or compensation except such as he might derive from the profits or dividends after the payment of all expenses, which included the payment of twenty-five dollars a week to Winston. This may or may not have been a bad deal from the viewpoint of the latter, but certainly there is no evidence of fraud connected with it. Smoak performed the agreement faithfully on his part and for at least ten months Winston accepted the benefits of the situation. The record not only fails to establish fraud, but the undisputed facts as to Winston's affirmative acts and his acceptance of the situation created thereby are sufficient

to support a finding of estoppel against him unless the issuance of the disputed stock was void as a matter of law.

The trial court has found that the Smoaks did not pay any money or transfer any property to the corporation, or perform any labor for it, in payment for the stock issued to them. The conclusion is drawn that, therefore, the issuance of this stock was illegal and contrary to the provisions of section 69 of the Stock Corporation Law. We think this conception of the statute on the undisputed facts is erroneous. The statute does not require that corporation stock must be paid for by the money, labor or property of the person to whom it is issued. It merely requires that the corporation shall receive full value for all of the stock issued. This requirement was fully met by the conveyance to the corporation by the plaintiff of property whose value was far in excess of the amount of the capital stock. The fact that plaintiff had entered into an agreement to issue one-half of this stock to the defendant Smoak or his nominee, and that such agreement was performed in no way alters the fundamental proposition that the corporation itself had received full value. The corporate records clearly indicate that the only consideration for the issuance of the stock was the transfer of plaintiff's property to the corporation. This was sufficient to satisfy the statute and in the absence of fraud, plaintiff may not void his contract on the theory of a statutory violation. On a factual basis the cases cited by respondent differ materially from this case and offer no precedent for the affirmance of the judgment appealed from.

Some point has been made as to a sale of some of the corporation property by a majority of the directors without notice to the plaintiff. Any issue involving this act is not before the court in this case and cannot be considered as relevant to this appeal.

For the reasons indicated the judgment should be reversed and the complaint dismissed.

HILL, P. J., CRAPSER, HEFFERNAN and SCHENCK, JJ., concur.

Finding 12 is reversed except that part that finds an agreement between the parties.

Findings of fact 22, 23 and 24 reversed and all conclusions of law disapproved.

Judgment reversed on the law and facts and complaint dismissed, with costs in all courts.